COURT OF 
APPEALS
SECOND 
DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-01-408-CV
 
  
WILLIAM 
J. MILLER                                                               APPELLANT
  
V.
  
KENNEDY 
& MINSHEW, PROFESSIONAL                                   APPELLEES
CORPORATION 
A/K/A KENNEDY, MINSHEW,
CAMPBELL 
& MORRIS, P.C., AND A/K/A
KENNEDY, 
MINSHEW & CAMPBELL, P.C.,
AND 
ROBERT MINSHEW
  
------------
 
FROM 
THE 235TH DISTRICT COURT OF COOKE COUNTY
 
------------
 
OPINION
 
------------
I. Introduction
        In 
this fee forfeiture case, the primary issue we must decide is whether the trial 
court abused its discretion by ruling that no forfeiture was required where the 
jury found that appellees, who are attorneys, breached their fiduciary duty to 
their client, appellant William J. Miller; that Miller ratified appellees’ 
misconduct and committed fraud; and that both appellees and Miller breached 
their retainer fee agreement and were negligent, but only appellees suffered 
damages. Because we conclude that the trial court’s ruling was not an abuse of 
discretion and that none of Miller’s other complaints require a reversal of 
this case, we affirm the trial court’s judgment.
II. Factual and Procedural Background
        In 
January 1994, Miller, accompanied by his accountant, contacted Robert Minshew, 
an attorney with the law firm of Kennedy & Minshew, P.C. (the law firm),[1] about defending Miller in a lawsuit involving a dispute 
over losses on a commercial building (the Snuggs matter). Miller and the law 
firm entered into a contingency fee agreement concerning the Snuggs matter. 
Minshew eventually obtained a reversal of an arbitration award of $30,000 
against Miller and secured Miller’s release from 90% of the debt on the 
building.
        Meanwhile, 
in February 1994, Miller discussed with Minshew problems related to his 
ownership in and control of North Texas Communications Company, Inc. (NTCC), a 
telephone and cable television business. Miller was chairman of the board of 
NTCC. He and his wife, Terese, owned 2500 shares, or 50%, of NTCC’s stock. 
Alvin Fuhrman, NTCC’s president, and his wife owned the other 50% of the 
stock.
        Miller 
was unhappy with his role in NTCC. He believed Fuhrman was “running the 
company like it was his own,” rather than as an equal partnership, that 
Fuhrman was not keeping him adequately informed of company business, and that 
NTCC should have been paying dividends. Miller told Minshew that he had 
contemplated selling the Millers’ interest in NTCC to either Fuhrman or a 
third party, but had not been able to negotiate an acceptable sale price. For 
example, a company had offered to purchase the Millers’ stock for $5 million 
in 1992, but that deal fell apart when the company could not acquire 100% of 
NTCC’s stock. In February 1994, Miller had also offered to sell the Millers’ 
stock to Fuhrman for $5.5 million. Fuhrman had countered with an offer for 
$4,577,201, including interest, over a nine-year period, which had a cash value 
equivalency of approximately $3 million.
        At 
meetings in February and December 1994, Miller and Minshew discussed Miller’s 
concerns and what could be done to address them. There is conflicting evidence 
concerning what representations Minshew made to Miller during these meetings 
about his expertise. Miller and Fran Voth, Miller’s secretary and business 
partner, [2] testified that Minshew said he could 
take care of all of Miller’s problems, including getting NTCC to pay $200,000 
per year in dividends, getting Miller equal control in the company, and getting 
Fuhrman to allow Miller’s family members to work there. Miller and Voth 
further testified that Minshew stated he could throw NTCC into receivership 
anytime Miller wanted—something that was very attractive to Miller. Minshew 
denied representing that he had any expertise in the area of retained earnings 
or dividend potential, but acknowledged stating that he had experience with 
corporate receiverships and that he knew the threat of a receivership got 
everyone’s attention.
        By 
December 1994, Miller was ready to hire appellees to represent him in his 
dealings with NTCC, and Miller and Minshew discussed the terms of a retainer fee 
agreement (RFA). Although Minshew offered to work for $150 per hour, Miller 
insisted on a contingent fee arrangement. Thus, the compensation section of the 
RFA provided that, if appellees were “instrumental” in obtaining a sale of 
the Millers’ NTCC stock to Fuhrman or a third party on terms and conditions 
acceptable to the Millers, appellees would receive a fee equal to 20% of the net 
sale proceeds, up to $500,000. The $500,000 cap was included at Miller’s 
request. The law firm was hesitant to agree to a contingent rather than an 
hourly fee because a forced sale might never occur for reasons unrelated to the 
law firm’s work or the possibility of the sale itself. Consequently, Miller 
agreed to a section providing for the transfer of eighty shares of the 
Millers’ stock to the law firm in the event work had been performed but the 
stock was not sold within twelve months.
        Minshew 
gave Miller a draft of the RFA, which Miller took home to review and discuss 
with Voth. The Millers kept the RFA for approximately two weeks before returning 
to the law firm to sign it. On January 27, 1995, after reading the agreement 
aloud, the Millers and the law firm executed the RFA. The Millers acknowledged 
in the RFA that appellees had “made no guarantees regarding the successful 
resolution of matters for which [they had] been retained, and all expressions 
relative thereto are matters of [appellees’] opinion only and shall not be 
considered as express or implied warranties of the outcome of any such efforts 
on behalf of [appellees].” Before execution of the agreement, Minshew had 
never met or represented Terese Miller.
        Although 
the Millers employed Minshew to assist in selling the NTCC stock, they did not 
intend to sell the stock. Miller testified that he had no intention of selling 
in 1995, 1996, or 1997. He also admitted there was nothing for Minshew to do 
until the Millers were ready to sell. Miller failed to disclose this information 
to appellees and instead allowed Minshew to work on the stock sale and other 
matters from January 1995 through February 1998, without pay or demand for pay.
        In 
February 1995, the Millers borrowed $100,000 from the law firm. Minshew 
testified that, although the loan was discussed before the RFA was signed and 
was secured by half of the Millers’ NTCC stock, it was not a condition of the 
RFA. Miller testified that he doubted he would have entered the RFA if the 
$100,000 loan had not been “part of” the agreement because he needed some 
ready cash; however, there is no reference in the RFA to the loan.
        The 
RFA contained a section entitled “Duties and Authority of Attorneys,” which 
provided that appellees were to “perform various legal duties in carrying out 
the purposes and intents of this Agreement, and [were] authorized, but [were] 
not to be limited,” to do several things, including:
 
1.examine 
all books and records of NTCC and its subsidiary and affiliated companies, 
including careful examination of all compensation paid to and fringe benefits 
received by Fuhrman and his family members;
 
2.examine 
all records and reports of NTCC and its subsidiary and affiliated companies on 
file with any state or federal regulatory agency;
 
3.take 
legal action, if necessary, to establish the Millers’ right and authority to 
“effectively participate” in NTCC’s business affairs and to be effectively 
represented by their 50% ownership in NTCC;
 
4.file 
suit, if necessary, to recover on NTCC’s behalf any “unreasonable” 
compensation or benefits provided Fuhrman or his family;
 
5.file 
suit, if necessary, to establish NTCC’s capability to pay dividends to its 
shareholders.

 
        Minshew 
did not personally do any of these things, but in June 1995 he hired James 
Keller, a CPA, to prepare a valuation of NTCC and the Millers’ stock. Minshew 
assumed that Keller would do anything listed in the first two categories of the 
“Duties and Authority” section that was necessary to properly value a 
company; however, Keller did not know about this provision and therefore did not 
do everything listed in it. Keller did go to NTCC’s accounting firm in the 
fall of 1995, where he reviewed NTCC’s audit and tax files, but he did not 
examine any of NTCC’s books and records because they were not available at the 
accounting firm. He then prepared a valuation of NTCC and placed a maximum value 
of $4.5 million on the Millers’ stock.
        Miller 
rejected Keller’s stock valuation as unacceptable. Although Miller said he 
would suggest alternative terms for the stock sale, he did not do so. Keller 
also investigated the possibility of NTCC paying dividends in 1995, but Minshew 
did not make a demand on Fuhrman for payment of a dividend. In February 1996, 
however, Minshew prepared a letter to Fuhrman that addressed many of Miller’s 
concerns and threatened a receivership. Miller told Minshew not to send the 
letter. After several months passed, Miller stated that NTCC was expanding its 
fiberoptic cables routes and that, as a result, he preferred not to strap the 
company for cash through a forced stock buyout.
        By 
September 1996, the Millers still had not authorized any action on the potential 
sale of their NTCC stock. Consequently, at the law firm’s request, the Millers 
confirmed in writing that they did not want the law firm to take any action on 
the stock sale. Although the Millers’ stock had not sold within the first 
twelve months after the RFA was executed, appellees did not seek to enforce the 
alternative compensation provision that entitled them to eighty shares of the 
stock.
        Meanwhile, 
in August 1995, Miller sought a second loan from the law firm for $75,000 
because he wanted to invest more money in oil leases. This loan, like the 
previous one, was secured by the Millers’ stock in NTCC, but was unrelated to 
the RFA. Although the Millers became badly delinquent on both notes, the law 
firm never made any demand for payment or took any other action on the notes or 
security.
        Minshew 
also continued to do other work for Miller. He assisted Miller in obtaining 
revocation of a power of attorney that Miller had executed regarding a business 
venture, prepared contracts for Miller regarding a pump business, assisted 
Miller with his problems as Mayor of the City of Muenster, recovered $80,000 for 
Miller from Fuhrman based on the use of NTCC money on an investment project, and 
helped the Millers recover $186,500 in payments from NTCC or its subsidiary. 
Miller did not offer to pay Minshew anything for his services in 1995, 1996, or 
1997 because Miller considered him to be working on a contingency fee basis.
        Terese 
Miller passed away in January 1997. At a board of directors’ meeting in April 
1997, Miller was reminded that he would need legal proof of who had the right to 
vote Terese’s stock by the annual shareholders’ meeting in September, or he 
would not be allowed to vote Terese’s stock at that meeting. The minutes from 
the April meeting were read and approved at the May 1997 board of directors’ 
meeting, at which Miller was present.
        Minshew 
eventually learned of Terese’s death from a third party. He knew that Miller 
could not vote Terese’s stock until it was transferred to him. In June 1997, 
Minshew offered to handle the probate of Terese Miller’s estate so that 
unclear ownership of her stock would not preclude or delay sale of the stock 
when Miller decided to sell it. In July, Miller provided Minshew Terese’s will 
to probate and said he wanted to pursue the stock sale. In the inventory and 
appraisement that Minshew prepared and filed in probate, Miller valued the 2500 
shares of NTCC stock at $6 million.
        In 
late May or early June 1997, Miller became angry with Fuhrman and instructed 
Minshew to “throw the company into receivership immediately.” On August 22, 
1997, Minshew, with Miller’s approval, sent Fuhrman a letter demanding 
$9,600,000 in cash or a $10,600,000 term price for the Millers’ 50% stock 
interest. Alternatively, the letter threatened a receivership proceeding against 
NTCC.
        Also 
in August 1997, Miller asked appellees for help in obtaining a $550,000 bank 
loan, part of which he intended to use to pay off his indebtedness to appellees. 
Minshew referred Miller to American Bank of Texas and talked with the loan 
officers there about the value of and ongoing efforts to sell Miller’s NTCC 
stock. In order to induce the bank to make the loan to Miller, appellees agreed 
to subordinate their security interest in Miller’s NTCC stock to the bank’s 
interest. In return, the bank agreed to withhold approximately $220,000 in 
disbursements from the loan to pay off Miller’s notes and accrued interest to 
appellees.
        In 
a financial statement furnished to the bank, Miller valued the NTCC stock at $7 
million. During the loan application process, the bank’s vice president, 
Howard Manning, reviewed the RFA, which Miller had provided him, and pointed out 
that if the stock sold, Miller would owe appellees 20% of the sale price up to 
$500,000. Miller acknowledged this provision in the RFA, but told Manning he was 
not going to pay appellees that much money.
        On 
the afternoon of September 2, 1997, Miller called and asked Minshew to meet him 
at NTCC. Minshew had not read NTCC’s bylaws or the minutes from its board 
meetings, so he was unaware that NTCC’s annual shareholders’ meeting was 
scheduled for September. Minshew assumed that the purpose of the meeting was to 
discuss the August 22 letter; however, he learned upon arrival that NTCC’s 
annual shareholders meeting was scheduled for that evening. Miller was not 
allowed to vote Terese’s stock at the meeting because it had not yet been 
transferred to him in the probate proceeding. As a result, the composition of 
NTCC’s board changed so that it was stacked against Miller. At the meeting, 
Minshew threatened NTCC with litigation, and Fuhrman offered to buy the 
Millers’ stock for $5 million to avoid litigation. When Miller did not accept 
Fuhrman’s $5 million offer, Minshew suggested an independent appraisal, to 
which Fuhrman agreed.
        After 
the shareholders’ meeting, Minshew told Miller that the “worst case 
scenario” as a result of the realignment of NTCC’s board was that it might 
delay for one year Miller’s ability to throw the company into receivership. 
Minshew explained that it is much harder to force a company into receivership if 
there is no deadlock within the board of directors. Minshew believed that a sale 
of Miller’s stock could be achieved without a receivership, however, because 
of Fuhrman’s desire to avoid litigation and purchase Miller’s stock. Miller 
had lost all confidence in Minshew because of the shareholders’ meeting; 
nonetheless, he continued to seek legal services from appellees.
        Minshew 
began working with Fuhrman’s attorney to obtain an independent appraisal of 
the stock, and the attorneys located and agreed upon an independent appraiser. 
Meanwhile, Fuhrman asked Cathey, Hutton, and Associates, a telecommunications 
management consulting firm, to prepare a valuation of NTCC. Based on that 
valuation, Fuhrman raised his offer for Miller’s stock to $6 million. Miller 
did not accept the offer.
        In 
late January 1998, while Minshew worked to obtain the independent appraisal, 
Miller tentatively agreed to sell his NTCC stock to a Mr. Flusche for a 
purported $6.5 million, which included a $200,000 loan. Miller asked the law 
firm to review the contracts that he planned to execute the next morning. 
Minshew worked late into the night to review the documents and discovered that 
the structure of the deal could have resulted in Miller’s loss of his stock 
for only $200,000. The next morning, Minshew faxed Miller a four-page document 
outlining why Miller should not consummate the sale and then spoke with him by 
telephone. Miller explained that he needed $200,000 cash that day. Minshew 
advised Miller that, if he needed the $200,000 immediately, he should ask 
Fuhrman to buy the stock for $6 million and pay $200,000 up front.
        After 
the discussion with Minshew, Miller agreed to sell his stock to Fuhrman for $6 
million, including $200,000 cash “up front” and $800,000 cash at closing. 
The deal closed on February 13, 1998. In a state inheritance tax return later 
prepared by Miller’s CPA, Miller reported that he had sold his stock in an 
“arms length” transaction for $6 million.
        After 
the February 1998 closing, the law firm requested in writing that Miller pay the 
contingency fee as provided by the RFA. Miller initially agreed to pay the fee 
after he received his second million-dollar payment from Fuhrman. Shortly 
thereafter, however, Miller stated that he would not pay the $500,000. Instead, 
he offered to pay Minshew only on an hourly basis.
        Minshew 
prepared the federal estate tax return for Terese Miller’s estate, and Miller 
signed it on June 11, 1998. Six days earlier, on June 5, Miller had filed the 
underlying lawsuit. Miller sued appellees for breach of contract, legal 
malpractice and negligence, breach of fiduciary duty, fraud, and DTPA 
violations. Appellees counterclaimed for breach of contract, fraud, and to 
recover their unpaid attorney’s fees.
        After 
a jury trial, the jury found in favor of Miller on his breach of fiduciary duty, 
negligence, DTPA violations, and breach of contract claims, but that Miller had 
suffered no damages as a result of the alleged conduct underlying these claims. 
On appellees’ counterclaims, the jury found that Miller had breached the RFA 
and committed fraud and that Minshew and the law firm had suffered $500,000 in 
damages as a result of the breach and $500,000 in damages as a result of the 
fraud. The jury found, however, that some or all of appellees’ claims for 
damages were barred by appellees’ breach of their fiduciary duty to Miller. 
Finally, the jury found that Minshew was instrumental in obtaining the sale of 
Miller’s NTCC stock on terms and conditions that were acceptable to Miller and 
that appellees were entitled to recover $500,000 from Miller as a result.
        Based 
on the jury’s verdict, the trial court rendered a take-nothing judgment for 
Miller and a judgment for appellees for $500,000, plus pre- and post-judgment 
interest and attorney’s fees. This appeal followed.
III. Issues on Appeal
        Miller 
complains that the trial court’s judgment is erroneous because:

•the RFA 
was invalid;
•the RFA 
and appellees’ attorney’s fees were unreasonable;
•the trial 
court abused its discretion by concluding that no fee forfeiture was required 
under the facts of this case;
•appellees’ 
recovery under the RFA is barred by their prior material breaches of the RFA;
•the 
trial court improperly construed the “Duties and Authority of Attorneys” 
section of the RFA;
•appellees 
waived their right to compensation under the RFA;
•Miller 
did not ratify appellees’ failure to comply with the RFA or their wrongful 
acts;
•Miller 
did not commit fraud;
•the 
jury charge did not comply with the evidence;
•the 
trial court abused its discretion by allowing two undesignated defense experts 
to testify at trial;
•Miller 
is entitled to recoup from appellees the interest he paid on the two loans that 
they made to him; and
•Miller 
is entitled to recover attorney’s fees based on the jury’s breach of 
contract and DTPA findings.
 
IV. Invalidity of RFA
 
        In 
the first issue raised in his opening brief, Miller contends that the RFA was 
invalid as a matter of law because it was “legally unconscionable,” 
“unethical,” and “unenforceable” for various reasons. Miller abandons 
this position in his reply brief, however, asserting instead that “[t]he 
standard for fee disputes in civil litigation is reasonableness” and that 
the unconscionability standard applies only to situations involving disciplinary 
matters. Accordingly, we will not address Miller’s invalidity arguments.
V. Reasonableness of RFA and Attorney’s Fee
        Miller 
contends the $500,000 judgment for appellees is erroneous because there is no 
evidence that the RFA or appellees’ fee was fair and reasonable.[3]  Although no jury issue was submitted on the fairness 
and reasonableness of the RFA, the jury was specifically instructed in the 
court’s charge that appellees had the burden to prove that the RFA was fair 
and reasonable. We must assume that the jury properly followed this instruction.[4]
        In 
determining a “no-evidence” issue, we are to consider only the evidence and 
inferences that tend to support the finding and disregard all evidence and 
inferences to the contrary.[5]  Anything more 
than a scintilla of evidence is legally sufficient to support the finding.[6]   More than a scintilla of evidence exists if 
the evidence furnishes some reasonable basis for differing conclusions by 
reasonable minds about the existence of a vital fact.[7]
        When 
an attorney-client relationship exists at the time a fee agreement is made, a 
rebuttable presumption of unfairness or invalidity attaches to the agreement, 
and the attorney has the burden of proving its fairness and reasonableness.[8]  Whether the fee agreement is fair and reasonable is 
judged at its inception.[9]  Factors to be 
considered in determining reasonableness include, but are not limited to:
1) 
the time and labor required, the novelty and difficulty of the questions 
involved, and the skill requisite to perform the legal service properly;
 
2) 
the likelihood . . . that the acceptance of the particular employment will 
preclude other employment by the lawyer;
 
3) 
the fee customarily charged in the locality for similar legal services;
 
4) 
the amount involved and the results obtained;
 
5) 
the time limitations imposed by the client or by the circumstances;
 
6) 
the nature and length of the professional relationship with the client;
 
7) 
the experience, reputation, and ability of the lawyer or lawyers performing the 
services; and
 
8) 
whether the fee is fixed or contingent on results obtained or uncertainty of 
collection before the legal services have been rendered.[10]
  
        In 
this case, the record contains the following evidence of the fairness and 
reasonableness of the RFA and appellees’ attorney’s fee:
A. Fee customarily charged
        Frank 
Douthitt, an experienced trial lawyer, a former general counsel for the State 
Bar of Texas, and a former state district judge, testified that a 20% contingent 
fee was less than a typical contingent fee. Douthitt explained that a contingent 
attorney fee could range from twenty-five to fifty percent, but that the most 
common contingent fee was one-third. In addition, Miller himself insisted on 
contracting for a contingent fee, rather than an hourly one, and negotiated the 
$500,000 cap on the fee for the stock sale.
B. Uncertainty of collection
        Douthitt 
opined that there was “certainly nothing unreasonable or unethical” about 
the RFA and that appellees “got the short end of the deal” because Miller 
had the right to refuse to sell his stock, in which case there would be no fee. 
Indeed, the 20% contingent fee with the $500,000 cap was not triggered unless 
and until Miller decided to sell his stock—something he did not intend to do 
when he entered the RFA and did not do for several years. Even the eighty-share 
alternative compensation provision did not eliminate the risk of nonpayment. Had 
it been enforced, appellees would have recovered only $192,000—if they had 
sold the eighty shares to Fuhrman on the same terms as Miller—and they would 
have been required to provide another three years’ legal services at no 
charge.[11]
C. Time and labor required; Amount involved and 
results obtained
        The 
law firm was hired to represent the Millers “in all matters relating to the 
affairs of [NTCC] and its affiliated and subsidiary companies,” but appellees’ 
compensation was tied primarily to their being “instrumental” in obtaining a 
sale of the Millers’ stock on terms acceptable to them or their obtaining 
dividends for the Millers. Miller implies that appellees drafted the RFA in this 
way so that a minimal amount of work under the agreement would entitle them to 
their fee. This argument ignores the fact that Minshew offered to work for an 
hourly fee and that it was Miller, not appellees, who insisted on the contingent 
fee arrangement. Further, Minshew anticipated that obtaining a forced sale of 
the Millers’ stock might not occur at all. Indeed, the RFA itself contemplated 
that the stock sale might not occur for a year or more despite appellees’ 
provision of legal services. Finally, the RFA obligated appellees to represent 
the Millers in “all matters” relating to NTCC, even though only certain 
legal services would entitle them to any compensation.
        This 
evidence is more than a scintilla of evidence that the RFA and the $500,000 
contingent fee provision were fair and reasonable when the RFA was executed.[12]  We overrule Miller’s first issue.
VI. Fee Forfeiture
        In 
his second and fourth issues, Miller contends that, in light of the evidence 
supporting the jury’s findings on Miller’s claims against appellees and the 
evidence that appellees improperly loaned Miller money, the trial court abused 
its discretion by concluding that no fee forfeiture was required in this case.
        “A 
lawyer engaging in clear and serious violation of duty to a client may be 
required to forfeit some or all of the lawyer’s compensation for the 
matter.”[13]  Fee forfeiture is an equitable 
remedy whose primary purpose is not to compensate the injured client, but to 
protect the relationship of trust between attorney and client by discouraging 
attorney disloyalty.[14]  Forfeiture is not 
justified in each instance in which a lawyer violates a legal duty; some 
violations are inadvertent or do not significantly harm the client.[15]  Thus, the remedy is restricted to “clear and 
serious” violations of duty.[16]
        Whether 
a fee forfeiture should be imposed must be determined by the trial court based 
on the equity of the circumstances.[17]  Certain 
matters, however, are fact issues for the jury to decide.[18]  
Such issues include but are not limited to whether or when the alleged 
misconduct occurred, the attorney’s mental state and culpability, the value of 
the attorney’s services, and the existence and amount of harm to the client.[19]
        Once 
the necessary factual disputes have been resolved, the trial court must 
determine whether the attorney’s conduct was a clear and serious breach of 
duty to his client, whether any of the attorney’s compensation should be 
forfeited, and if so, the amount.[20]  Factors 
the trial court is to consider in making these determinations include the 
adequacy of other remedies, the weight to be given all other relevant issues, 
and, most importantly, whether forfeiture is necessary to satisfy the public’s 
interest in protecting the integrity of the attorney-client relationship.[21]
        We 
review the trial court’s fee forfeiture determination under an abuse of 
discretion standard.[22]  A trial court does not 
abuse its discretion unless it acts arbitrarily or unreasonably, without 
reference to any guiding rules or principles.[23]  
Merely because a trial court may decide a matter within its discretion in a 
different manner than an appellate court would in a similar circumstance does 
not demonstrate that an abuse of discretion has occurred.[24]  
We may not substitute our judgment for the trial court’s unless the trial 
court’s action was so arbitrary that it exceeded the bounds of reasonable 
discretion.[25]
        Legal 
and factual sufficiency are relevant factors to be considered in assessing 
whether the trial court abused its discretion.[26]  
An abuse of discretion does not occur, however, where the trial court bases its 
decisions on conflicting evidence, as long as some evidence reasonably supports 
the trial court’s decision.[27]
        In 
this case, the jury made the following fact findings necessary for the trial 
court to determine whether appellees’ fee should be forfeited:
  
•Appellees 
failed to comply with their fiduciary duty to Miller; made negligent 
misrepresentations to him (Minshew only); and engaged in false, misleading, or 
deceptive acts or practices.[28]  The jury also 
found, however, that appellees committed no willful misconduct—no fraud, no 
unconscionable conduct, and no knowing or intentional misconduct.[29]
  
•Appellees 
were negligent. The jury attributed 40% of the negligence to Minshew and 19% to 
the law firm,[30] but found that appellees were not 
grossly negligent.
  
•Appellees 
and Miller breached the RFA, but Miller was estopped from denying that he was 
bound by the terms of the contract.
  
•Appellees’ 
breach of their legal duty to Miller occurred early in the parties’ 
relationship and several years before the stock sale in February 1998; Miller 
should have discovered appellees’ breach of their fiduciary duty by January 
27, 1995, which was the date the RFA was executed; and Miller should have 
discovered appellees’ DTPA violations and negligence by October 15, 1996.
  
•Minshew 
was instrumental in obtaining a sale of Miller’s NTCC stock upon terms and 
conditions acceptable to him, and appellees were entitled to a $500,000 fee as a 
result.
   
•Miller 
ratified appellees’ conduct and their failure to comply with the RFA, and he 
was estopped from claiming that the value of his NTCC stock at the time of the 
stock sale was more than $6 million.
   
•Miller 
suffered no damages as a result of any of appellees’ conduct.[31]

        Based 
on these jury findings, the trial court determined that the timing of appellees’ 
misconduct or duty violations caused Miller no significant harm and did not 
affect the value of appellees’ work for him.[32]  
The trial court also concluded that appellees’ misconduct or violations of 
duty were not clear and serious; that appellees’ misconduct had no impact or 
effect on the public’s interest in protecting the attorney-client 
relationship;[33]  and that Miller’s request 
for a fee forfeiture should therefore be denied.
        We 
conclude that the jury’s findings reasonably support the trial court’s 
findings and conclusions. Thus, we hold that the trial court did not abuse its 
discretion in determining that no fee forfeiture was required in this case.
        Miller 
contends that the jury’s finding that some or all of appellees’ claims for 
damages were barred by their breach of fiduciary duty clearly shows the 
“public’s viewpoint” that a fee forfeiture should be required in this 
situation. We disagree. Not every breach of fiduciary duty requires a fee 
forfeiture.[34]  Moreover, the propriety and 
amount of a fee forfeiture are legal issues for the court, not the jury.[35]  A jury question on a legal issue is immaterial 
because it calls for a finding beyond the province of the jury[36]  
Therefore, both the question regarding appellees’ damages claims and the 
jury’s answer to it were immaterial. Thus, to the extent that the jury’s 
answer can be read as a finding that appellees’ recovery of their fee is 
barred because of their breach of their fiduciary duty to Miller, the trial 
court properly disregarded this finding.[37]
VII. Prior Material Breaches
        Miller 
contends that appellees’ material breaches of the RFA excuse him from paying 
appellees their attorney’s fees under the RFA because appellees’ breaches of 
the RFA preceded his breach of the RFA.[38]  The 
jury found, however, that Miller’s breach of the RFA was not excused, 
and Miller does not challenge the sufficiency of the evidence to support this 
finding. In light of this finding and the evidence supporting it, we hold that 
appellees’ alleged material breaches of the RFA did not preclude them from 
recovering their attorney’s fees. We overrule Miller’s second and fourth 
issues.
VIII. Trial Court’s Construction of the RFA
        In 
his third issue, Miller complains that the trial court misconstrued the 
“Duties and Authority of Attorneys” section of the RFA by ruling that this 
section did not impose any contractual duties on appellees.[39]  
Miller asserts that the trial court’s erroneous construction prevented him 
from fully presenting his case to the jury because it precluded him from putting 
on evidence that appellees’ failure to do the things listed in the “Duties 
and Authority” section proximately caused his breach of contract damages. 
Miller also argues that the trial court’s ruling prohibited the jury from 
finding that he suffered damages as a result of appellees’ breach of the RFA.
        The 
parties agreed that the RFA was unambiguous, so the trial court construed it as 
a matter of law.[40]  Miller did not object 
during trial to the trial court’s construction of the “Duties and 
Authority” section. As a result, his complaints regarding the trial court’s 
construction of this section are waived.[41]  We 
overrule Miller’s third issue.
IX. Waiver of Compensation
        In 
his fifth issue, Miller contends that appellees are precluded, as a matter of 
law, from recovering damages under the RFA because they waived their right to 
compensation under the RFA. The jury found, however, that appellees did not 
waive their claims for damages against Miller and were not estopped from 
asserting those claims. Miller does not challenge these findings. Instead, he 
asserts that, because appellees waived their right to eighty shares of the 
Millers’ stock under the alternate compensation provision in paragraph (c) of 
the RFA, they waived any rights they may have had to contractual compensation as 
a matter of law. This argument is premised entirely upon Miller’s contention 
that “[p]roper construction” of compensation paragraphs (a) and (c) 
“confirms that they are mutually exclusive.”[42]  
Miller offers no explanation for this assertion, and we are unable to discern 
why he believes the paragraphs are mutually exclusive. Because this argument is 
not adequately briefed, Miller’s fifth issue is overruled.[43]
X. Miller’s Ratification of Appellees’ Actions
        In 
his sixth issue, Miller challenges the legal and factual sufficiency of the 
evidence to support the jury’s ratification findings.[44]  
In addition, Miller asserts that the trial court should have disregarded the 
jury’s ratification findings because they irreconcilably conflict with the 
findings that appellees breached their fiduciary duty to Miller and engaged in 
false, misleading, or deceptive acts or practices, and because the ratification 
defense is not available where a breach of fiduciary duty has occurred. We will 
address these arguments in turn.
        A 
person ratifies an unauthorized act if, by word or conduct, with knowledge of 
all material facts, he confirms or recognizes the act as valid.[45]  Ratification may be inferred by a party’s course 
of conduct and need not be shown by express word or deed.[46]  
Ratification may also occur when a principal retains the benefits of a 
transaction after acquiring full knowledge of his agent’s unauthorized act.[47]  The critical factor is the principal's knowledge 
of the transaction and his actions in light of such knowledge.[48]
        In 
this case, the jury found that Miller ratified appellees’ “failure to 
comply.” The jury was instructed that, for ratification of appellees’ 
failure to comply to occur, Miller had to continue to accept benefits under the 
RFA after he became aware of the failure to comply, with full knowledge of the 
failure to comply at the time of the ratification and with intent to ratify the 
RFA in spite of the failure to comply.
        The 
jury also found that Miller ratified appellees’ “conduct.” The jury was 
instructed that, for ratification of appellees’ conduct to occur, Miller had 
to continue to accept benefits under the RFA after he became aware of the 
misrepresentations, or to recognize the RFA as binding, with full knowledge of 
the misrepresentations at the time of the ratification and with intent to ratify 
the RFA in spite of the misrepresentations.
        Miller 
testified that, when he learned at the September 1997 shareholders’ meeting 
that he could not vote Terese’s stock, he “lost all confidence” in Minshew 
because “he didn’t take care of me. Everything that he promised me before, 
why, it was out the window.” Miller contends that, at that time, he decided he 
was not going to pay appellees for their services under the RFA because “they 
hadn’t earned it.”
        After 
the September 1997 meeting, however, Miller allowed Minshew to continue to 
attempt to obtain an independent appraisal of his NTCC stock, asked Minshew to 
review his agreement to sell his stock to Mr. Flusche, and, based on Minshew’s 
advice against the Flushe deal, decided to sell his stock to Fuhrman instead for 
an arrangement that involved the immediate cash that Miller claimed he needed. 
Minshew testified that the closing on the sale of Miller’s stock to Fuhrman 
was “a pretty festive occasion,” that Miller was very happy, and that he 
shook Minshew’s hand and thanked him. After the closing, appellees asked 
Miller to pay the $500,000 contingency fee as provided by the RFA. Miller 
initially agreed to pay the $500,000 fee after he received his second 
million-dollar payment from Fuhrman. It was only later that Miller stated he 
would not pay the $500,000, but instead wanted to pay only on an hourly basis.
        This 
evidence shows that Miller continued to accept benefits under the RFA with full 
knowledge of appellees’ unauthorized acts and that, at least initially after 
the stock sale occurred, he recognized the RFA as binding. Thus, we hold that 
the evidence is legally and factually sufficient to support the jury’s 
findings that Miller ratified appellees’ misconduct and failure to comply with 
the RFA.[49]
        Despite 
sufficient evidentiary support for the jury’s ratification findings, Miller 
contends that these findings irreconcilably conflict with the jury’s breach of 
fiduciary duty and DTPA findings. He asserts that the breach of fiduciary duty 
and DTPA findings were based on a finding that appellees failed to “fully and 
fairly disclose all important information to [him] concerning the transaction” 
and that he therefore could not have ratified with full knowledge of appellees’ 
misconduct. Failure to disclose, however, was only one of several acts or 
omissions submitted to the jury as a basis for Miller’s breach of fiduciary 
duty and DTPA claims.[50]  The jury could have 
found a breach of fiduciary duty and DTPA violations based on any of the other 
acts or omissions, none of which conflict with the ratification findings. 
Moreover, the jury found that Miller should have discovered appellees’ breach 
of fiduciary duty and DTPA violations by January 1995 and October 1996, 
respectively.
        We 
must try to interpret jury findings in a manner that upholds the trial court’s 
judgment.[51]  If there is any reasonable basis 
upon which jury findings can be reconciled, we may not disregard them on the 
ground of conflict.[52]  Because other grounds 
submitted to the jury support the breach of fiduciary duty and DTPA findings and 
the jury found that Miller discovered the facts that appellees allegedly failed 
to disclose early in the parties’ relationship, we hold that there is a 
reasonable basis upon which the challenged findings can be reconciled. 
Accordingly, we overrule Miller’s sixth issue.[53]
XI. Miller’s Fraud
        Miller 
challenges the legal and factual sufficiency of the evidence to support the 
jury’s finding that he committed fraud against appellees based on his failure 
to disclose a material fact.[54]  Miller asserts 
that, at most, his actions amounted to a mere breach of contract, not fraud. In 
addition, Miller contends that the evidence does not support the damages award 
for fraud.
        A 
person commits fraud if he (1) makes a false, material misrepresentation (2) 
that he either knows to be false or asserts recklessly without knowledge of its 
truth (3) with the intent that it be acted upon, (4) and the person to whom the 
misrepresentation is made acts in reliance upon it (5) and is injured as a 
result.[55]  A misrepresentation may consist of 
the concealment or nondisclosure of a material fact when there is a duty to 
disclose.[56]  The duty to disclose arises when 
one party knows that the other party is ignorant of the true facts and does not 
have an equal opportunity to discover the truth.[57]  
A fact is material if it would likely affect the conduct of a reasonable person 
concerning the transaction in question.[58]
        The 
record shows that Minshew offered to work for an hourly fee, but Miller insisted 
on a fee arrangement that was contingent, in large part, upon appellees being 
instrumental in obtaining a sale of the Millers’ NTCC stock on terms and 
conditions acceptable to them. The $500,000 cap on the contingent fee was 
included in the RFA at Miller’s request. When the parties entered into the RFA 
in January 1995, however, Miller had no intention of selling his stock. Indeed, 
Miller testified that he had no intention of selling in 1995, 1996, or 1997. 
Minshew, on the other hand, believed that Miller desired to pursue a forced 
buyout of the stock from December 1994 forward. Based on the RFA, Minshew 
rendered Miller legal services on the stock sale and other matters from January 
1995 through February 1998, without pay or demand for pay. In addition, 
appellees never attempted to enforce the alternative compensation provision in 
the RFA that entitled them to eighty shares of Miller’s stock if the stock did 
not sell within a year.
        Miller 
testified that he never offered to pay for Minshew’s services “[b]ecause it 
was a contingency basis.” Miller told a bank loan officer, however, that he 
did not intend to perform the $500,000 contingency provision in the RFA.
        This 
evidence shows that Miller induced appellees to enter into the $500,000 
contingent fee provision in the RFA by withholding from them the fact that he 
had no intention of doing the very thing that would give rise to his contractual 
duty to perform under that provision—sell his NTCC stock. The evidence also 
shows that appellees reasonably relied on Miller’s failure to disclose in 
entering into the RFA and that the bulk of the work they performed under the RFA 
for three years was done in reliance upon it. After Miller’s stock eventually 
sold, he still did not pay the $500,000 fee, but offered to pay Minshew an 
hourly rate. Although Miller testified that he did not want to pay the $500,000 
contingent fee because appellees had not earned it, the jury could have 
concluded, based on the evidence, that Miller had never intended to pay this 
fee. Thus, the evidence is legally and factually sufficient to support the 
jury’s finding that Miller committed fraud.[59]
        The 
evidence also supports the jury’s finding that appellees were entitled to 
recover $500,000 as benefit-of-the-bargain damages. Benefit-of-the-bargain 
damages are simply the difference between the value as represented and the value 
received.[60]  Under this measure of damages, 
the defrauded party may recover lost profits that he would have made if the 
bargain actually struck had been performed as promised.[61]  
Here, the record shows that appellees would have received $500,000 if Miller had 
performed as promised under the RFA, but that Miller paid nothing.[62]  Thus, Miller’s evidentiary challenge to the 
jury’s damages award for fraud fails. We overrule Miller’s arguments 
concerning the jury’s fraud findings.
XII. Jury Charge
A. Excuse
        In 
his seventh issue, Miller complains about several parts of the charge. Miller 
first challenges the jury question on whether he or appellees were excused from 
failing to comply with the RFA. The jury was instructed that failure to comply 
with the RFA was excused if Miller waived compliance with the RFA, if Miller 
committed fraud upon which appellees relied, or if the parties had agreed that a 
new term would take the place of the breached term. Miller requested an 
additional instruction that his failure to comply was excused if appellees 
waived compliance with the RFA or if appellees committed fraud upon which Miller 
relied. The trial court denied this request, and the jury found that none of the 
parties’ conduct was excused.
        Miller 
asserts that the trial court’s overruling of his requested instruction was 
reversible error because the instruction given misled the jury by not 
instructing them how his failure to comply with the RFA could be excused. We 
disagree. The jury was instructed that Miller’s breach of the RFA was excused 
if the parties had agreed that a new term would take the place of the breached 
term. Further, the waiver and fraud grounds for excuse that Miller requested 
were submitted elsewhere in the charge, and the jury found against Miller on 
both issues. The jury found that appellees did not waive their claims for 
damages against Miller, that their claims against him were not barred by fraud, 
and that appellees did not fraudulently induce Miller to enter the RFA. Thus, 
assuming, for argument’s sake, that the trial court’s ruling, or the jury 
instruction as given, was improper, no reversible error occurred.[63]  We overrule this argument.

B. Estoppel
        Next, 
Miller asserts that the trial court erred by submitting a jury question on 
whether he was judicially estopped from claiming that the value of his NTCC 
stock at the time of the February 1998 sale was more than $6 million. Miller 
objected to the estoppel question on the basis that he had not taken an 
inconsistent position against appellees in a prior judicial proceeding. “Under 
the doctrine of judicial estoppel . . . a party is estopped merely by the fact 
of having alleged or admitted in his pleadings in a former proceeding under oath 
the contrary to the assertion sought to be made.”[64]  
The party invoking the doctrine need not have been a party to the former 
proceeding.[65]
        Miller’s 
sworn statement in the inventory and appraisement that his stock was worth $6 
million was made under oath in a prior judicial proceeding, and it was contrary 
to his assertion at trial that his stock was worth much more than that amount. 
Accordingly, the trial court did not err by overruling Miller’s objection to 
the judicial estoppel issue. We overrule this argument.

C. Damages
        Miller 
also contends that trial court reversibly erred by submitting the jury 
instruction on breach of contract damages because the instruction improperly 
told the jury to consider as an element of Miller’s damages the loss of his 
NTCC stock’s fair market value as a consequence of appellees’ fraud, rather 
than their failure to comply with the RFA. The reference to appellees’ fraud 
was only one element of the damages instruction. The instruction also told the 
jury to consider two other elements of damages for Miller: (1) the difference 
between his financial position as a result of appellees’ failure to comply 
with the RFA and his position if they had complied; and (2) the difference 
between the amount he received for his NTCC stock and the market value of his 
stock. Miller does not explain how, in light of the entire damages instruction, 
the wording of the challenged element probably caused the rendition of an 
improper judgment.[66]   Accordingly, we 
overrule this argument.

D. Waived Complaints
        Finally, 
Miller makes numerous complaints about the jury charge that are waived because 
they either were not raised at the charge conference or are inadequately briefed 
on appeal,[67] including:
  
•the 
doctrine of judicial estoppel does not apply to the inventory and appraisement 
he filed in Terese’s probate proceeding—in which he swore under oath that 
the 2500 shares of NTCC stock were worth $6 million—because (1) appellees were 
responsible for preparing the inventory and “advising him in how to complete 
the forms,” (2) due to appellees’ misconduct, he was unaware of the true 
value of his stock when he signed the document, and (3) the inventory could be 
supplemented;

•the 
estoppel questions were immaterial because they were questions of law for the 
trial court to decide;

•the 
evidence is insufficient to support the jury’s estoppel finding;[68]

•the 
trial court erred by submitting a jury question on whether he was equitably 
estopped from denying that he was bound by the terms of the RFA; and

•the 
fraud issue was immaterial and should not have been submitted to the jury 
because it was not supported by appellees’ pleadings.

We 
overrule Miller’s seventh issue.
XIII. Undesignated Experts
        In 
his eighth issue, Miller asserts that the trial court reversibly erred by 
allowing Alan Rohmer and Hubert G. Bares to testify regarding their valuations 
of NTCC because neither Rohmer nor Bares was designated as a testifying expert 
in appellees’ response to Miller’s request for disclosure.
        A 
party may request disclosure of a testifying expert’s identity, the subject 
matter on which the expert will testify, a summary of the expert’s mental 
impressions and opinions, and the data that the expert reviewed in anticipation 
of his testimony.[69]  The purpose of this 
pretrial disclosure rule is to give the opposing party sufficient information 
about the expert's opinions to prepare to cross-examine the expert and to 
prepare expert rebuttal evidence.[70]  A party 
who fails to timely provide this information once it has been requested may not 
offer the expert’s testimony unless the trial court finds that there was good 
cause for the failure to timely provide the information or that the failure to 
provide the discovery will not unfairly surprise or prejudice the other party.[71]  The burden of establishing good cause or lack of 
unfair prejudice or surprise is on the party seeking to call the witness, and 
the trial court’s finding of good cause or lack of prejudice or surprise must 
be supported by the record.[72]  We review the 
trial court’s ruling under an abuse of discretion standard.[73]
        In 
this case, Rohmer was designated as a fact witness in appellees’ response to 
Miller’s disclosure request, but neither Rohmer nor Bares was listed as a 
testifying expert. Consequently, Miller moved to exclude Rohmer’s and 
Bares’s expert testimony.
        At 
the hearing on Miller’s motion, appellees pointed out that they had listed 
both Rohmer and Bares as expert witnesses on their anticipated trial witness 
list; Miller had deposed Bares by written questions; over a year before trial, 
appellees had provided Miller Bares’s interrogatory responses and the written 
valuation of NTCC that he had prepared for Cathey, Hutton, and Associates;[74] Miller had deposed Rohmer, a NTCC employee who had also 
valued NTCC, over a year before trial; and Rohmer had provided Miller all of the 
data underlying his valuation of NTCC. Appellees argued that Miller would not be 
unfairly surprised by Rohmer’s and Bares’s testimony because he had had the 
substance of their testimony, as well as their discovery responses, valuations, 
and underlying data, for over a year and had devoted considerable expert 
testimony at trial to attacking their methodologies and valuations.
        The 
trial court ruled that Rohmer and Bares could testify because of the length of 
time Miller had known of the substance of their testimony and because Miller’s 
experts had devoted so much time to attacking their valuation reports. This 
record supports the trial court’s finding that allowing Rohmer and Bares to 
testify would not unfairly surprise or prejudice Miller; therefore, the trial 
court’s ruling allowing their testimony was not an abuse of discretion.[75]  We overrule Miller’s eighth issue.
 
XIV. Recoupment of Interest
        In 
his ninth issue, Miller contends that, as a matter of law, he is entitled to 
recoup the $42,000 in interest he paid to appellees on the two loans that they 
made to him because the loans constituted a breach of appellees’ fiduciary 
duty.[76]  Miller asserts that the loans were 
impermissible because they were made to induce him to enter the RFA.
        There 
is no indication in the record that the jury’s finding that appellees breached 
their fiduciary duty was based on the loans. None of the instructions on the 
breach of fiduciary duty issue mentions the loans. In addition, the jury found 
that Miller should have discovered appellees’ breach of their fiduciary duty 
by January 27, 1995, which was before either loan was made. The jury also found 
that Miller ratified appellees’ misconduct by continuing to accept benefits 
under the RFA. In view of these jury findings, there is no basis for awarding 
Miller the interest he paid on the loans; therefore, Miller is not entitled to 
recoup this interest from appellees.[77]  We 
overrule this argument.
XV. Attorney’s Fees
        Finally, 
Miller asserts that he is entitled to attorney’s fees based on the jury’s 
breach of contract and DTPA findings. A party is not entitled to recover 
attorney’s fees on a breach of contract or DTPA claim absent a recovery of 
actual damages or something of value.[78]  A 
plaintiff who receives nominal or zero damages is not entitled to attorney’s 
fees.[79]
        The 
jury did not award Miller damages or anything of value. Therefore, the trial 
court did not err by not awarding him attorney’s fees.[80]  
We overrule Miller’s ninth issue.
XVI. Conclusion
        Having 
disposed of all of Miller’s issues, we affirm the trial court’s judgment.
 
 
                                                                  JOHN 
CAYCE
                                                                  CHIEF 
JUSTICE
 
 
PANEL 
A:   CAYCE, C.J.; WALKER, J.; and SAM J. DAY, J. 
(Retired, Sitting by Assignment).
 
DELIVERED: 
November 20, 2003
  

NOTES
1. 
The law firm has also been known as Kennedy, Minshew, Campbell & Morris, 
P.C. and Kennedy, Minshew & Campbell, P.C. We sometimes refer to Minshew and 
the law firm collectively as “appellees.”
2. 
Voth was present at the meetings between Minshew and Miller.
3. 
Miller also asserts that the judgment is erroneous because appellees did not 
plead that their fee was reasonable or submit a jury issue on reasonableness. 
Miller does not, however, direct us to any place in the record where this 
complaint was raised in the trial court, and our review of the record has 
revealed none. Therefore, this argument is waived, and we will not consider it. See 
Tex. R. App. P. 33.1(a); Bushell 
v. Dean, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh’g); see also 
Rogers v. Stell, 835 S.W.2d 100, 101 (Tex. 1992) (holding that complaint on 
appeal must be the same as that presented in the trial court).
4. 
See Turner, Collie & Braden, Inc. v. Brookhollow, Inc., 642 S.W.2d 
160, 167 (Tex. 1982).
5. 
Bradford v. Vento, 48 S.W.3d 749, 754 (Tex. 2001); Cont’l Coffee 
Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); In re King's 
Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).
6. 
Cazarez, 937 S.W.2d at 450; Leitch v. Hornsby, 935 S.W.2d 114, 118 
(Tex. 1996).
7. 
Rocor Int’l, Inc. v. Nat’l Union Fire Ins. Co., 77 S.W.3d 253, 262 
(Tex. 2002).
8. 
Archer v. Griffith, 390 S.W.2d 735, 739 (Tex. 1964); accord Keck, 
Mahin & Cate v. Nat’l Union Fire Ins. Co., 20 S.W.3d 692, 699 & 
n.3 (Tex. 2000); Honeycutt v. Billingsley, 992 S.W.2d 570, 582 (Tex. 
App.—Houston [1st Dist.] 1999, pet. denied) (op. on reh’g). 
Appellees argue that Miller, not appellees, had the burden to prove the fairness 
and reasonableness of the RFA because there was no attorney-client relationship 
between them and Miller regarding NTCC at the time the RFA was executed. 
Appellees did not, however, object to the trial court’s instruction on these 
grounds; therefore, this argument is waived. See Tex. R. App. P. 33.1(a); Rogers, 
835 S.W.2d at 101. Further, we note that the evidence shows that Miller and 
appellees’ attorney-client relationship regarding NTCC began in February 1994, 
when Miller first discussed with Minshew his problems related to NTCC.
9. 
Archer, 390 S.W.2d at 740.
10. 
Tex. Disciplinary R. Prof’l Conduct 
1.04(b), reprinted in Tex. Gov’t 
Code Ann., tit. 2, subtit. G app. A (Vernon 1998) (Tex. State Bar R. art. X, § 9); Arthur 
Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 818 (Tex. 1997).
11. 
We do not consider whether the eighty-share alternative compensation provision 
was fair and reasonable because appellees never sought to enforce the provision.
12. 
In one sentence, Miller contends that the jury’s breach of fiduciary duty 
finding “effectively negates” the jury’s finding that the RFA was fair and 
reasonable. We do not address this argument because it is not briefed. See 
Tex. R. App. P. 38.1(h); see 
also Fredonia State Bank v. Gen. Am. Life Ins. Co., 881 S.W.2d 279, 284 
(Tex. 1994) (noting that argument may be waived due to inadequate briefing). In 
addition, because there is some evidence that the RFA and appellees’ fee were 
reasonable, we need not reach Miller’s assertion that the contractual and 
fraud damages cannot be upheld on the ground that there is no evidence of the 
fee’s fairness and reasonableness. See Cazarez, 937 S.W.2d at 450; Archer, 
390 S.W.2d at 740.
13. 
Burrow v. Arce, 997 S.W.2d 229, 241 (Tex. 1999) (quoting Restatement (Third) of Law Governing Lawyers 
§ 37 (2000)).
14. 
Id. at 238, 245.
15. 
Id. at 241.
16. 
Id.; Restatement (Third) of Law 
Governing Lawyers § 37 & cmt. d.
17. 
Burrow, 997 S.W.2d at 245; State v. Tex. Pet Foods, Inc., 591 
S.W.2d 800, 803 (Tex. 1979).
18. 
Burrow, 997 S.W.2d at 245-46; see also Tex. Pet Foods, 591 S.W.2d 
at 803 (stating that, in an equitable proceeding, “ultimate issues of fact are 
submitted for jury determination”).
19. 
Burrow, 997 S.W.2d at 246.
20. 
Id.
21. 
Id. at 245-46.
22. 
See id. at 242-43; Restatement 
(Third) of Law Governing Lawyers § 37 cmt. b (both stating that the fee 
forfeiture remedy should be applied with discretion); Jackson Law Office, 
P.C. v. Chappell, 37 S.W.3d 15, 23 (Tex. App.—Tyler 2000, pet. denied) 
(applying abuse of discretion standard of review to trial court’s fee 
forfeiture determination).
23. 
See Carpenter v. Cimarron Hydrocarbons Corp., 98 S.W.3d 682, 687 (Tex. 
2002); Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 
1985), cert. denied, 476 U.S. 1159 (1986).
24. 
Downer, 701 S.W.2d at 241-42.
25. 
Butnaru v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 2002).
26. 
Beaumont Bank v. Buller, 806 S.W.2d 223, 226 (Tex. 1991); Tex. Dep’t 
of Health v. Buckner, 950 S.W.2d 216, 218 (Tex. App.—Fort Worth 1997, no 
pet.).
27. 
Butnaru, 84 S.W.3d at 211; Davis v. Huey, 571 S.W.2d 859, 862 
(Tex. 1978).
28. 
The jury was not asked whether appellees’ loans to Miller were improper and 
therefore did not make a finding on that issue. Irrespective of the propriety of 
the loans, the evidence does not show, as Miller implies, that appellees simply 
waited for him to default on the loans, rather than rendering services under the 
RFA, because of the stock interest he had given them to secure the loans. To the 
contrary, in September 1996, the Millers confirmed in writing that they did not 
want appellees to take any action on the stock sale, and appellees never took 
any action against Miller on the loans, even though he became badly delinquent 
on both of them.
29. 
Conversely, the jury found that Miller committed fraud against appellees.
30. 
The jury attributed the remaining 41% of the negligence to Miller.
31. 
In contrast, the jury found that appellees suffered $500,000 in damages due to 
Miller’s breach of the RFA and $500,000 in damages because of his fraud. The 
jury also found that appellees had not waived their damages claims against 
Miller and were not estopped from asserting them.
32. 
Miller contends that these trial court findings are irrelevant and immaterial 
because only the jury can resolve factual disputes in a forfeiture proceeding. 
Where an abuse of discretion standard of review applies to a trial court's 
ruling, findings of fact and conclusions of law aid us in reviewing the 
propriety of the ruling by providing us with an explanation for the ruling. Chrysler 
Corp. v. Blackmon, 841 S.W.2d 844, 852 (Tex. 1992); Samuelson v. United 
Healthcare of Tex., Inc., 79 S.W.3d 706, 710 (Tex. App.—Fort Worth 2002, 
no pet.). The trial court’s fact findings are helpful in this case because 
they demonstrate how the court weighed “all other relevant considerations” 
to the forfeiture issue. Burrow, 997 S.W.2d at 245.
33. 
Although the trial court mislabeled some of its conclusions of law as 
“Findings of Fact,” they are nonetheless legal conclusions on matters 
committed to the court’s discretion. See id. at 246.
34. 
Id. at 241.
35. 
Id. at 246; Jackson Law Office, 37 S.W.3d at 23.
36. 
S.E. Pipe Line Co. v. Tichacek, 997 S.W.2d 166, 172 (Tex. 1999); Spencer 
v. Eagle Star Ins. Co. of Am., 876 S.W.2d 154, 157 (Tex. 1994).
37. 
See S.E. Pipe Line Co., 997 S.W.2d at 172; Great Am. Prods. v. 
Permabond Int’l, 94 S.W.3d 675, 682 (Tex. App.—Austin 2002, pet. 
denied). Even assuming the jury’s breach of fiduciary duty findings were 
material to the trial court’s fee forfeiture determination, the jury was asked 
only whether appellees’ damages claims were barred, not whether appellees 
should be required to forfeit their fee. Indeed, in response to a different 
question, the jury found that appellees were entitled to recover $500,000 from 
Miller as a result of being instrumental in obtaining a sale of his stock upon 
terms and conditions acceptable to him.
38. 
Generally, a party’s breach of mutually dependent, reciprocal promises in a 
contract excuses performance by the other party. Hanks v. GAB Bus. Servs., 
Inc., 644 S.W.2d 707, 708 (Tex. 1982); Shaw v. Kennedy, Ltd., 879 
S.W.2d 240, 247 (Tex. App.—Amarillo 1994, no writ). Treating a contract as 
continuing after a breach, however, deprives the nonbreaching party of any 
excuse for terminating his own performance. Hanks, 644 S.W.2d at 708; Chilton 
Ins. Co. v. Pate & Pate Enters., Inc., 930 S.W.2d 877, 888 (Tex. 
App.—San Antonio 1996, writ denied).
39. 
See supra at part II for the contents of this section.
40. 
See MCI Telecomms. Corp. v. Tex. Utils. Elec. Co., 995 S.W.2d 647, 650 
(Tex. 1999); Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983).
41. 
See Tex. R. App. P. 
33.1(a); Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex.), cert. denied, 
530 U.S. 1244 (2000).
42. 
Compensation paragraph (a) provided:
In 
the event that actions of attorneys are instrumental in obtaining a sale of 
Clients’ shares to Fuhrman or to a third party, upon terms and conditions 
acceptable to Clients, Attorneys shall receive[] a fee equal to 20%, not to 
exceed $500,000.00, of the net proceeds to be received by Clients from such 
sale, to be paid by Clients to Attorneys if and when received by Clients.
        Compensation 
paragraph (c) provided:
In 
the event that Attorney’s services are rendered as set forth above, but do not 
result in a sale of Clients’ stock on terms and conditions acceptable to 
Clients . . . Clients agree to assign eighty shares of stock in [NTCC] to 
Attorneys in return for which Attorneys agree to continue to represent Clients 
in all legal matters relating to the affairs of [NTCC] and all other personal 
legal matters, without additional fee, for a period of three (3) years from and 
after the date of such transfer of stock. The obligation to transfer stock in 
accordance with the provision of this paragraph shall arise if and only if 
Clients[‘] shares have not been sold as set forth above within twelve (12) 
months from the date hereof.
43. 
Because Miller has waived his argument that appellees waived their right to 
compensation under the RFA, we do not address Miller’s related arguments that 
appellees breached their fiduciary duty by waiving their right to compensation 
in the form of stock in order to “gain the economic advantage of obtaining a 
greater fee” and by failing to disclose their waiver to Miller.
44. 
Miller also complains that the jury questions on ratification did not properly 
define ratification because the trial court did not instruct the jury that 
Miller was required to have full knowledge of all material facts. This complaint 
is waived because Miller did not raise it at the charge conference. See Tex. R. App. P. 33.1(a); Osterberg, 
12 S.W.3d at 55.
45. 
Mo. Pac. R.R. Co. v. Lely Dev. Corp., 86 S.W.3d 787, 792 (Tex. 
App.—Austin 2002, pet. dism’d); Garrison Contractors, Inc. v. Liberty Mut. 
Ins. Co., 927 S.W.2d 296, 302 (Tex. App.—El Paso 1996), aff’d, 
966 S.W.2d 482 (Tex. 1998).
46. 
Mo. Pac. R.R. Co., 86 S.W.3d at 792.
47. 
Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc., 609 S.W.2d 754, 756 
(Tex. 1980).
48. 
Id.
49. 
Miller’s related argument that the acceptance of benefits doctrine applies to 
this case is waived because Miller did not request that the issue be submitted 
to the jury. See Tex. R. Civ. P. 
278.
50. 
In addition to failure to disclose, five other acts or omissions were submitted 
to the jury in support of Miller’s breach of fiduciary claim: (1) the 
transactions in question were not fair and equitable to him; (2) appellees did 
not make reasonable use of the confidence Miller placed in them; (3) appellees 
did not act in utmost good faith and exercise the most scrupulous honesty 
towards Miller; (4) appellees placed their interests before Miller’s or used 
their position to gain a benefit for themselves at Miller’s expense; and (5) 
appellees placed themselves in a position where their self-interests might 
conflict with their fiduciary obligations. In addition, the jury was instructed 
that appellees violated the DTPA if they represented that their services had or 
would have characteristics or benefits that they did not; that the services were 
or would be of a particular standard or quality if they were of another; or that 
an agreement conferred or involved rights, remedies, or obligations that it did 
not have or involve.
51. 
First Fed. Sav. & Loan Ass'n v. Sharp, 359 S.W.2d 902, 903 (Tex. 
1962); Rice Food Mkts., Inc. v. Ramirez, 59 S.W.3d 726, 733-34 (Tex. 
App.—Amarillo 2001, no pet.).
52. 
Bender v. S. Pac. Transp. Co., 600 S.W.2d 257, 260 (Tex. 1980).
53. 
We do not address Miller’s contention that ratification is inapplicable in 
this case due to the jury’s breach of fiduciary duty finding, because he cites 
no relevant authority to support his position. See Tex. R. App. P. 38.1(h); Fredonia 
State Bank, 881 S.W.2d at 284. The sole case on which Miller relies is 
inapposite because it involved a breach of fiduciary finding that the agent had 
committed constructive fraud and had significantly benefitted from his breach at 
his principal’s expense. See Spangler v. Jones, 861 S.W.2d 392, 395-96 
(Tex. App.—Dallas 1993, writ denied), disapproved on other grounds by 
Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507 
(Tex. 1998). Here, however, the jury found that Miller committed fraud, 
but that appellees did not, and that Miller was not harmed by appellees’ 
breach of their fiduciary duty.
54. 
Miller’s related complaints, that the fraud issue is immaterial and that the 
trial court should not have submitted the issue to the jury because it was not 
supported by appellees’ pleadings, are waived because they either are 
inadequately briefed on appeal or were not raised at the charge conference. See 
Tex. R. App. P. 33.1(a), 38.1(h); Osterberg, 
12 S.W.3d at 55; Fredonia State Bank, 881 S.W.2d at 284.
55. 
Formosa Plastics Corp. USA v. Presidio Eng’rs & Contractors, Inc., 
960 S.W.2d 41, 47-48 (Tex. 1998); State Nat’l Bank v. Farah Mfg. Co., 678 
S.W.2d 661, 681 (Tex. App.—El Paso 1984, writ dism’d by agr.).
56. 
Custom Leasing, Inc. v. Tex. Bank & Trust Co., 516 S.W.2d 138, 142 
(Tex. 1974); New Process Steel Corp. v. Steel Corp. of Tex., Inc., 703 
S.W.2d 209, 214 (Tex. App.—Houston [1st Dist.] 1985, writ ref’d 
n.r.e.).
57. 
New Process Steel Corp., 703 S.W.2d at 214.
58. 
Custom Leasing, 516 S.W.2d at 142. Here, the jury was instructed that 
Miller committed fraud if he concealed or failed to disclose a material fact 
within his knowledge; knowing that appellees were ignorant of the fact and did 
not have an equal opportunity to discover the truth; with the intent to induce 
appellees to take some action due to the concealment or failure to disclose; and 
appellees suffered injury as a result of acting without knowledge of the 
undisclosed fact.
59. 
See Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406 (Tex.), cert. 
denied, 525 U.S. 1017 (1998); Cazarez, 937 S.W.2d at 450
60. 
Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 681 (Tex. 2000); Formosa 
Plastics Corp., 960 S.W.2d at 49.
61. 
Formosa Plastics Corp., 960 S.W.2d at 50. In this case, the jury was 
instructed to consider the difference, if any, between the amount of contractual 
benefits agreed to under the RFA and the amount of contractual benefits paid.
62. 
Miller erroneously relies on the Texas Supreme Court’s decision in Conoco 
for the proposition that, to recover benefit-of-the-bargain damages, appellees 
were required to prove the bargain they would have made if they had known that 
Miller did not intend to pay the $500,000 fee. The plaintiff in Conoco 
sought, as benefit-of-the-bargain damages, lost profits for a bargain that 
allegedly would have been struck, but was not, due to the defendant’s fraud. 
The supreme court held that a party may recover lost profits in that situation 
if there is evidence of the bargain that would have been struck had the 
defrauded party known the truth. Conoco, 52 S.W.3d at 681-82. We do not 
have the Conoco situation here; instead, appellees sought only the lost 
profits that they would have received if the bargain actually struck—the 
$500,000 contingency fee provision in the RFA—had been performed as promised.
63. 
See Tex. R. App. P. 
44.1(a)(1) (providing that trial court’s judgment may not be reversed based on 
error of law unless error probably caused rendition of an improper judgment).
64. 
Long v. Knox, 155 Tex. 581, 291 S.W.2d 292, 295 (1956).
65. 
Id.
66. 
See Tex. R. App. P. 
44.1(a)(1).
67. 
See Tex. R. App. P. 
33.1(a); Osterberg, 12 S.W.3d at 55; Fredonia State Bank, 881 
S.W.2d at 284.
68. 
Miller cites neither evidence nor case law to support his evidentiary challenge. 
We note, however, that the same evidence that supports the jury’s fraud 
finding is legally and factually sufficient to support an equitable estoppel 
finding. See Nelson v. Jordan, 663 S.W.2d 82, 87 (Tex. App.—Austin 
1983, writ ref’d n.r.e.) (stating that elements of equitable estoppel are a 
false representation or concealment of material fact, made with knowledge of the 
facts, to a party without knowledge of or the means of knowing those facts, with 
the intention that it should be acted upon, and detrimental reliance by the 
party to whom it was made).
69. 
Tex. R. Civ. P. 194.2(f).
70. 
Exxon Corp. v. W. Tex. Gathering Co., 868 S.W.2d 299, 304 (Tex. 1993); Taylor 
Foundry Co. v. Wichita Falls Grain Co., 51 S.W.3d 766, 773 (Tex. App.—Fort 
Worth 2001, no pet.).
71. 
Tex. R. Civ. P. 193.6(a); Vingcard 
A.S. v. Merrimac Hospitality Sys., Inc., 59 S.W.3d 847, 855 (Tex. 
App.—Fort Worth 2001, pet. denied) (op. on reh’g).
72. 
Tex. R. Civ. P. 193.6(b).
73. 
Bodnow Corp. v. City of Hondo, 721 S.W.2d 839, 840 (Tex. 1986); Vingcard, 
59 S.W.3d at 855.
74. 
Before the stock sale, Fuhrman hired Cathey, Hutton, and Associates to prepare a 
valuation of NTCC. Bares prepared the valuation for Cathey, Hutton.
75. 
See Carpenter, 98 S.W.3d at 687 (stating that trial court abuses its 
discretion if it acts without reference to any guiding rules and principles).
76. 
Miller also contends that the loans violated the Texas Disciplinary Rules, but 
acknowledges that disciplinary rule violations do not constitute independent 
causes of action.
77. 
The cases on which Miller relies to support his claim for recoupment are 
inapposite because, unlike this case, they involved situations in which the 
agents secretly benefitted from the transactions they performed on behalf of 
their principals. See Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 
193, 200-01 (Tex. 2002); Anderson v. Griffith, 501 S.W.2d 695, 701-02 
(Tex. Civ. App.—Fort Worth 1973, writ ref’d n.r.e.) (both holding that agent 
who secretly benefits from transaction performed on behalf of principal must 
disgorge profit).
78. 
Gulf States Utils. Co. v. Low, 79 S.W.3d 561, 567 (Tex. 2002); Green 
Int’l, Inc. v. Solis, 951 S.W.2d 384, 390 (Tex. 1997); ITT Commercial 
Fin. Corp. v. Riehn, 796 S.W.2d 248, 256 (Tex. App.—Dallas 1990, no writ).
79. 
Low, 79 S.W.3d at 567.
80. 
The two cases Miller cites to demonstrate that the trial court erred in not 
awarding him attorney’s fees are not on point. In those cases, the jury 
findings indicated that the prevailing parties were entitled to recover 
something of value, even though no damages were awarded. See Atl. Richfield 
Co. v. Long Trusts, 860 S.W.2d 439, 450 (Tex. App.—Texarkana 1993, writ 
denied) (upholding attorney’s fee award where jury found that breaching party 
did not owe prevailing party any money on breach of contract claim because 
prevailing party had been able to recoup most of its damages from breaching 
party while litigation was pending); Martini v. Tatum, 776 S.W.2d 666, 
669-70 (Tex. App.—Amarillo 1989, writ denied) (upholding attorney’s fee 
award where jury’s findings indicated that prevailing party would have been 
entitled to recover damages, but no damages issue was submitted).